# ST. LOUIS, IRON MOUNTAIN & SOUTHERN RAILWAY COMPANY

## *v.* AIKEN.

### Opinion delivered July 10, 1911.

1. MASTER AND SERVANT—NEGLIGENCE—EVIDENCE.—Where it was the duty of a hostler, in taking engines to and from the round house, to await signals from the assistant, and to give the latter notice before removing the engines, and he moved an engine without giving or receiving signals, a finding that the hostler was negligent, rendering the master liable for the assistant's injuries, will be sustained. (Page 440.)

2. SAME—CONTRIBUTORY NEGLIGENCE.—Proof that plaintiff, a hostler's assistant, being young and inexperienced, undertook, in discharge of his duties, to cross over a cinder pit behind the tender of an engine, relying upon a rule of the company that the hostler should not move the engine until plaintiff gave the signal, and was injured by reason of the engine being moved without warning, will sustain a finding that plaintiff was not guilty of contributory negligence. (Page 440.)

3. SAME—CONTRIBUTORY NEGLIGENCE—EVIDENCE.—In determining whether a servant was guilty of contributory negligence the jury should consider his age and experience. (Page 441.)

4. INSTRUCTIONS—REPETITION.—Refusal to give instructions upon a certain issue was not prejudicial where other instructions given were sufficiently specific and full to present the issue to the jury fully. (Page 441.)

5. MASTER AND SERVANT—NEGLIGENCE OF FELLOW-SERVANT.—Violation by a fellow-servant of a rule or custom established for the protection of employees in a hazardous occupation constitutes negligence *per se.* (Page 442.)

6. APPEAL AND ERROR—REMARKS OF COUNSEL—PREJUDICE.—A recital in the bill of exceptions that plaintiff's counsel was permitted, "over the objection of the defendant, to refer to the pathetic, bereft and unfortunate condition of the widowed mother of plaintiff, her want and distress following the injury of her boy and the presence of her little children and her dependence upon plaintiff for support," is insufficient to show what the remarks complained of were and whether they had a prejudicial effect. (Page 442.)

7. SAME—ARGUMENT OF COUNSEL—PREJUDICE.—In an action for personal injuries against a railroad company, plaintiff's counsel said: "These poor railroad boys—I feel sorry for them. Whenever they are called upon to testify, you place their testimony in one scale and their bread in another." Upon objection made, the court said: "The jury has the right to consider the witness' interest or bias or prejudice in the case as affecting their testimony." Before conclusion of the argument, the court entirely excluded the above remark. *Held,* that there was no prejudice, in view of the fact that there was nothing to indicate that the jury were influenced by such remark. (Page 444.)

8. JURY—STOPPING EXAMINATION—PREJUDICE.—Where, after a lengthy examination of a juror, the court stopped the examination, whereupon

defendant challenged the juror peremptorily, no prejudice resulted, in the absence of a showing that defendant exhausted its peremptory challenges and was compelled to accept an objectionable juror. (Page 445.)

9.    JURY—EXAMINATION OF JURORS—DISCRETION OF COURT.—The examination of jurors rests within the sound discretion of the trial court; and it was not an abuse of such discretion to stop an examination where defendant had been permitted to pursue the examination until every matter bearing on the juror's qualifications seems to have been fully drawn out.. (Page 446.)

Appeal from Franklin. Circuit Court, Ozark District; *Jeptha H. Evans,* Judge; affirmed.

*W. E. Hemingway* and *Lovick P. Miles,* for appellant.

The court erred in refusing to permit appellant to continue the examination of talesman R. T. Patrick. 24 Cyc. 341, 342; 7 Cranch 290; 57 Cal. 102; 23 Cal. 375; 121 Pa. St. 455; 14 Ga. 22; 8 So. 838; 69 Tex. 650; 83 Mo. 589; 2 Dev. & B. 212; 3 Wis. 827; 69 Ill. 303; 1 Denio 308; 5 Cal. 347; 69 Ark. 139; *Id.* 594; 71 Ark. 367; 51 Ark. 177.

The court should have directed a verdict for appellant, 91 Ark. 260; 86 Ark. 290; 91 U. S. 469; 105 *Id.* 249; 213 *Id.* 674. Appellant was entitled to an instruction defining "proximate cause." 59 Ark. 134; 69 Ark. 632,. The argument of counsel was improper and prejudicial. 70 Ark. 306; 61 Ark. 130; 74 Ark. 256; 58 Ark. 553; 52 Ark. 274; 53 Ark. 388; 93 Ark. 187; 45 Atl. 593; 55 N. E. 861; 115 Ill. 300; 39 Ill. App. 388; 71 Ark. 427; 89 Ark. 87; 70 Ark. 305; *Id.* 179; 63 Ark. 174; 87 Ark. 461; 30 N. W. 630.

*Jeff Davis* and *Frank Pace,* for appellee.

There was no error in the court exercising control over the examination of talesman R. T. Patrick. 139 Ill. 418; 158 U. S. 413; 7 App. 451; 74 Mo. 271; 93 N. W. 286; 21 Ark. 329; 10 Ark. 428; 5 Ark. 208; 23 Ark. 32; 20 Ark. 619; 58 Ark. 353; 34 Ark. 649; 38 Ark. 304; 69 Ark. 558.

The court properly refused to direct a verdict for appellant. White, Per. Inj., § 36. There was no error committed in the argument of the case that calls for its reversal. 74 Ark. 259; 90 Ark. 406; 89 Ark. 92; 77 Ark. 73; 91 Ark. 579; 78 Ark. 387; 93 Ark. 144; 75 Ark. 349; 48 Ark. 123; 76 Ark. 39; 87 Ark. 463; 63 Ark. 174; 61 Ark. 130; 70 Ark. 183; 65 Ark. 625; 93 Ark. 564.

McCULLOCH, C. J.    The plaintiff, W. T. Aiken, while working for defendant railway company, was run over by an engine; and both legs were cut off.    He was 17 years old at the time, and sues the company to recover compensation for said injury, alleging that the same was caused by negligence of the engine hostler who had charge of the engine at the time.    He recovered judgment below for damages in an amount which is not claimed to be excessive, and the defendant has appealed.

Plaintiff was working as assistant, or herder, as the position is termed, to the hostler.    He had been working for the company about two months, first as engine wiper and boiler washer, and then as herder for ten days before his injury occurred, working at night from 7 o'clock P. M. to 7 o'clock A. M.    His duties were to assist in taking engines to and from the roundhouse, and to coal and water them, to take incoming engines to the cinder pit and knock the fires and then take them to the roundhouse. He testified that it was his duty to ride moving engines in the yards, on the pilot when headed forward and on the stirrup on the engineer's side of the rear end of the tender when moving backward, in order to throw switches and to signal the hostler when to start or stop.    On the occasion in question the engine was on the cinder pit, and plaintiff, after assisting in knocking the fire, examined the sand box on top of the engine, and then blew the whistle for the hostler, who was in the roundhouse, to come and move the engine.    When the hostler mounted the engine, plaintiff remarked to him that the engine needed no sand, and got down from the engine on the fireman's side, and started back to the rear of the tender.    The hostler and another witness testified that plaintiff said:    "We don't need any sand; let's put her in," meaning to start for the roundhouse; but plaintiff denied that he said:    "Let's put her in," or anything else except that the engine didn't need sand.    Plaintiff started around the end of the tender to ride the stirrup on the hostler's side, placing one foot on a rod over the pit which binds the rails together and holding with one hand to a rod on the tender and a lantern in the other hand, when the hostler moved the engine backward without signal or warning, striking plaintiff, knocking him down, cutting both legs off and his body rolled into the pit, whence it was rescued after his screams attracted attention.

Defendant denied in its answer that the hostler was negli-

gent, and also pleaded that the injury resulted from plaintiff's own negligence in attempting to pass across the pit behind the tender of the engine.

It is earnestly insisted that the testimony is not sufficient to support the finding of the jury on either of those issues. We conclude, however, that the testimony is sufficient. The testimony of the plaintiff himself, which we must treat as having been accepted by the jury as true, shows that it was customary for the hostler to await a signal from the plaintiff before moving the engine, and that no signal was given; that it was the rule for the hostler to sound an alarm, by bell or whistle, before moving the engine, and that this was not done; and that plaintiff did not say to the hostler: "Let's put her in," or give him any other signal or intimation to move. There is much in the testimony of defendant's witnesses to contradict the plaintiff's statement of the facts, and much to corroborate him. They stated that the rule was for the hostler to sound a bell or whistle before moving, and that that was not done. Some of them testified that it was the duty of the herder to ride on the rear of the tender with a lantern when moving backward so as to display a light and to signal the hostler. The testimony is sufficient to show that the hostler violated his duty in moving the engine without a signal from plaintiff and without sounding a warning from the engine, and this warranted a finding of negligence on his part. It is not essential, in order to sustain the charge of negligence, that the hostler be shown to have known or had reason to believe, at the time he moved the engine, that plaintiff was in a place of danger. If it was his duty to await a signal from plaintiff, the exercise of ordinary care demanded that the engine be not moved unless he knew that the plaintiff was not exposed to danger; at least, the jury had the right to find negligence under those circumstances, whether the hostler knew of plaintiff's perilous position or not.

The testimony also sustains the finding that plaintiff was not guilty of negligence. He testified that it was customary to get down on the fireman's side and cross behind the tender by stepping on the binding rod while holding to the rod on the tender; that it was inconvenient to get over in any other way on the engineer's side of the tender, where it was necessary to place himself in order to give signals by lantern to the hostler.

Plaintiff could rely to some extent on the fact that the hostler was in duty bound not to move the engine until he gave the signal, and this was a proper element of consideration in determining whether or not he was negligent.    The jury had the right to consider plaintiff's age and the amount of his experience in that work in testing the degree of care to which he should be held. *Western Coal & Mining Co.* v. *Burns*, 84 Ark. 74; *Arkansas Midland Ry. Co.* v. *Worden*, 90 Ark. 407.

It is next contended that the court erred in refusing to give the following instructions which defendant requested, towit:

"III.    In determining whether the hostler, Harris, was negligent and his negligence was such as will entitle the plaintiff to maintain his action against the defendant, you are instructed that Harris, acting for defendant, was under obligation to exercise ordinary care in the handling or operation of the engine to protect from injury such employees as an ordinarily prudent man, situated as Harris, in the exercise of ordinary care, would have discovered or had reason to expect might be injured from the operation of the engine."

"IV.    If the hostler, Harris, in the exercise of ordinary care, had no reason to expect Aiken to be where he was when injured, it makes no difference whether the engine was moved as alleged in the complaint, and your verdict should be for defendant."

We think that the other instructions given on the subject of Harris's negligence were sufficiently specific and full to correctly present that issue to the jury, and that no prejudice resulted from refusing to give these two on that subject, even if they were correct.    These instructions were, however, not correct in their application to the proof in this case, for they entirely ignored the plaintiff's theory of the case, and laid down an erroneous test of negligence if the jury found with plaintiff on the disputed facts.    If, as stated by plaintiff in his testimony, it was customary for the hostler to await a start signal from the plaintiff and not to move the engine before receiving that signal from him nor without sounding the bell or whistle, then it constituted negligence for him to violate this rule, whether he was aware of plaintiff's perilous position or not.    Defendant's witnesses testified that plaintiff gave the hostler a signal to move by saying to him:    "Let's put her in;" and if these refused

instructions had been so framed as to submit that issue to the jury, they would have been correct; but they omitted this issue entirely, and unqualifiedly told the jury, in effect, that the question of Harris's negligence depended upon his knowledge of or reason to expect danger to some employee, even though he was forbidden by the custom to move the engine without first receiving a signal from the plaintiff, and violated his duty in that respect. Violation of a rule or custom established for the protection of employees in a hazardous occupation constitutes negligence *per se.* *St. Louis, I. M. & S. Ry. Co.* v. *Caraway*, 77 Ark. 405; *St. Louis, I. M. & S. Ry. Co.* v. *Dupree*, 84 Ark. 377.

The assignments of error most earnestly pressed on our attention relate to alleged improper arguments of counsel for plaintiff. The recital of the bill of exceptions relating to the first assignment on the subject reads as follows:

"Senator Davis, of counsel for plaintiff, was further permitted in the course of his argument, over the objection of the defendant, to refer to the pathetic, bereft and unfortunate condition of the widowed mother of plaintiff, her want and distress following the injury of her boy and the presence of her little children and her dependence upon plaintiff for support."

In *Kansas City Southern Ry. Co.* v. *Murphy*, 74 Ark. 256, Chief Justice HILL, speaking for the court, laid down the following rule, which has often been quoted here with approval, and which may be said to have become the settled rule of this court in dealing with assignments of error on this subject:

"When the ruling of the court is presented to the appellate court in proper manner, then it is the duty of the appellate court to look to the remarks, and weigh their probable effect upon the issues; then to the action of the trial court in dealing with them; and if the trial court has not properly eliminated their sinister effect, and they seem to have created prejudice, and likely produced a verdict not otherwise obtainable, then the appellate court should reverse. However, a wide range of discretion must be allowed the circuit judges in dealing with the subject, for they can best determine at the time the effect of unwarranted argument; but that discretion is not an arbitrary one, but that sound judicial discretion the exercise of which is a matter of review. * * * In the final analysis, the reversal

rests upon an undue advantage having been secured by argument which has worked a prejudice to the losing party not warranted by the law and facts of the case."

It being our duty to "look to the remarks and weigh their probable effect upon the issues," the language used by counsel should have been set forth in the record so that we could determine its probable effect upon the jury. We do not reverse judgments merely because some improper remark has been made by counsel in the course of argument, but it is only where it appears likely that prejudice resulted in an advantage which would not otherwise have been obtained. We cannot tell whether or not the remarks were calculated to prejudice the rights of defendant unless we know what was said. The recital in the record merely states a conclusion as to the reference made by counsel, without stating the language used upon which the conclusion is based and without showing the extent of the reference. The circuit judge evidently thought that the reference was too slight to have any prejudicial effect, and we might think so too if we had the language of the counsel before us. It is very indefinite merely to state that counsel *referred* to certain things. The term is too indefinite to give any idea of the effect that the reference could have had. Mrs. Aiken, plaintiff's mother, was a witness in the case, and testified to material matters tending to establish the extent of plaintiff's damages, his earning capacity and the extent of his physical pain. She was permitted to state without any objection from defendant the number, ages and sex of her children, the fact of her husband's death and the dependency of the whole family on her son, the plaintiff. Counsel did not seem to fear any prejudicial effect from this testimony on the minds of the jury, though it was clearly incompetent and doubtless would have been excluded by the court if the request had been made. The reference of counsel to the bereft condition of plaintiff's mother may, for aught we know, have been made merely by the use of adjectives in speaking her name to the jury as one of the witnesses in the case when he commented on her testimony. As before stated, we do not know how or to what extent he referred to her condition, and therefore can not determine whether the reference could have had any effect. We should not indulge the presumption that prejudice resulted unless we have enough before us

to be able to see whether or not the language used was calculated to operate to the prejudice of the other party. It is the duty of the complaining party to bring enough into the record to show that prejudice might have resulted. It would, of course, have been erroneous and prejudicial for counsel to make an appeal to the jury for a verdict on account of the pathetic and distressed condition of plaintiff's mother and her dependency on her son, or for an increase of the amount of damages on that account; for it is too plain for argument that her condition had nothing to do with plaintiff's right of recovery or with the amount of damages to be assessed. On the other hand, counsel had the right to comment on that part of her testimony which was material and competent, and, if in doing so he made slight reference to her condition, we can not say, without knowing the extent of the remark, whether or not it could have had any prejudicial effect.

The other exception to the argument of counsel appears in the record as follows:

"Mr. Pace, counsel for plaintiff, in the course of his argument to the jury on behalf of plaintiff, made the following remarks and statements to the jury over defendant's objections: 'These poor railroad boys—I feel sorry for them. Whenever they are called upon to testify, you place their testimony in one scale and their bread in another.' The defendant objected to the remark, and the court said the jury had the right to consider the witness' interest or bias or prejudice in the case as affecting their testimony, and railroad employees who are witnesses are, in their testimony, subject to the same rules as others—their testimony should be weighed exactly as that of other witnesses. To this action of the court, defendant excepted. Before the conclusion of the argument in the case the court entirely excluded the above remark of Mr. Pace and directed the jury to disregard it."

It is well settled by the decisions of this court that it constitutes reversible error for an attorney in a case to be permitted to go outside of the record and to state to the jury a material fact bearing on the question at issue. On the other hand, it is equally well settled that an attorney has the right in argument to express his opinion as to the effect of the evidence adduced and the inferences to be drawn therefrom. He may comment

on the relations of the witnesses to one of the parties as showing interest or bias on the part of the witnesses. *St. Louis, I. M. & S. Ry. Co.* v. *Raines,* 90 Ark. 398. Now, it is not clear from the language used by counsel whether he meant to express an opinion as an inference from the relation shown to exist between the defendant and its employees who testified in the case, or whether he meant to state as a fact in the case that the witnesses would be discharged and thereby lose their daily bread if the testimony they gave was unfavorable to defendant. The court seems to have construed the language of counsel merely as a comment on the interest of the witnesses as employees of the defendant, for the trial judge remarked, when first passing on the objection, that the "jury had the right to consider the witness' interest or bias or prejudice in the case as affecting their testimony." The silence of counsel at the time indicated his acquiescence in that construction of the language which he had used. But, be that as it may, the trial judge concluded later, during the argument, to exclude the remark, and did so, telling the jury to disregard it. It does not appear from the record how long after the remark was made before it was excluded. This remark does not fall within the class of objectionable arguments so flagrantly prejudicial in themselves that no action of the court can eradicate the effect. *St. Louis, I. M. & S. Ry. Co.* v. *Pell,* 89 Ark. 87; *St. Louis, I. M. & S. Ry. Co.* v. *Raines, supra.* Some deference must be given to the opinion of the trial judge in determining whether or not any prejudice has resulted from improper remarks and in eliminating them from the minds of the jury; and where there has been a timely exclusion of the objectionable remarks, we should not reverse a case unless we feel sure that the prejudicial effect was not removed. The fact is that the court told the jury before the close of the argument that they must disregard the remarks above referred to, and we must assume that the jury obeyed the court's admonition and gave no heed to the excluded remark of counsel. The testimony is not so scant, either as to the right of recovery or as to the amount of damages, as to indicate that the jury were influenced by anything other than the testimony in the case, which well sustained the verdict.

There is but one other assignment of error, and that relates to the ruling of the court in refusing to permit defendant's

counsel to pursue the examination of a juror as to his bias. After a lengthy examination of the juror by counsel the court stopped the examination, and said that it was sufficient. Counsel then challenged the juror peremptorily, and agreed to a trial of the case before eleven jurors. It does not appear from the record that defendant exhausted its peremptory challenges and was compelled to accept a juror which it otherwise would not have accepted; therefore no prejudice resulted from the ruling, even if it was incorrect. The extent of the examination of the juror rested, however, within the sound discretion of the trial court, and there was no abuse of that discretion. Defendant was permitted to pursue the examination until every matter bearing upon the juror's qualifications seems to have been fully drawn out.

Judgment affirmed.

WOOD and HART, JJ., dissent.

WOOD, J., (dissenting). The doctrine of comparative negligence or degrees of negligence is not recognized in this State. Where the negligence of the plaintiff, concurring with the negligence of the defendant, contributes to the injury of which the plaintiff complains, the defendant is not liable, even though its negligence may have been, at first, the greater. The law does not undertake to apportion the degrees of negligence; therefore, notwithstanding the negligence of the defendant, if the plaintiff could not have been injured but for his failure to exercise ordinary care for his own safety, then he can not recover. This is the doctrine of contributory negligence that had always obtained in this State to the time of the plaintiff's injury. *St. Louis, I. M. & S. Ry. Co.* v. *Freeman*, 36 Ark. 41; *Little Rock & Ft. S. Ry. Co.* v. *Parkhurst*, 36 Ark. 371; *Johnson* v. *Stewart*, 62 Ark. 164; *St. Louis & S. F. Rd. Co.* v. *Kilpatrick*, 67 Ark. 47; *Kansas City So. Ry. Co.* v. *McGinty*, 76 Ark. 356.

The appellant set up the defense of contributory negligence, and at the conclusion of the evidence prayed the court to direct a verdict in its favor. The court refused the prayer, and appellant now earnestly contends here that the court erred in so doing, and that the undisputed evidence shows that the plaintiff at the time of his injury was "pursuing an unusual

and unheard-of course" that contributed proximately to his injury.

It is stated in the opinion of the majority that the plaintiff, Aikin, testified as follows: "That it was customary to get down on the fireman's side and cross behind the tender by stepping on the binding rod while holding to the rod on the tender." If this statement be correct, then the above contention of appellant is groundless, for if Aikin, in crossing over the open cinder pit in the manner described, was pursuing the customary course and doing only what other hostler helpers were accustomed to do, then he was not negligent in so doing, and if he testified "that it was customary" to cross over in that manner, then it cannot be said that the undisputed evidence shows that he was pursuing an "unusual and unheard-of and not to be anticipated course," as appellant now insists. But appellant challenges the correctness of the above statement in its motion here for rehearing, and cites us to page 22 of the record, which is as follows: "Q. Now, Tobe, had you worked under this hostler you say three or four years before that you were with him when the engines were to be backed up? A. On the back end of the tender. Q. Right at the same place that you were going to at that time? A. Yes, sir. Q. What would you do when you got around there? A. If we were ready to go, I would give the signal to back up. Q. Had he ever started the engine before until you got back there and signalled? A. No, sir. Q. He never had? A. No, sir. Q. I am asking you whether or not it was customary to ring the bell or blow the whistle. A. Yes, sir. Q. Before the engine started? A. Yes, sir. Q. Had he, previous to that time, during the nights you were with him each time blown the whistle or rung the bell before he started? A. Yes, sir. Q. Each time before he started the engine? A. Yes, sir. Q. Now, Tobe, as you crossed the track, if I understand you correctly, there was a rod that held the two rails together. How far was the engine from that rod? A. Probably four or five or six inches. It was close. Q. You could pass along without the engine interfering with you? A. Yes, sir. Q. State to the jury what you did with reference to holding the engine. A. I had hold of the rod on the back of the engine with one hand, my lantern in the other hand. Q. Now, then, the engine

was standing there by this rod four feet, ten inches across from one rail to the other. Will you measure four feet ten inches here now—then it was, say the track was this wide and that rod just held these two rails together. Did it? A. Yes, sir."

Again at page twenty the plaintiff describes the cause of his injury as follows: "Yes, sir; I got down off of the boiler on the fireman's side, and when I got in the cab Mr. Harris was coming up in the gangway. I told him the engine did not need any sand. Then I got down on the fireman's side, and started around to give the signal to go ahead, and when I got behind the engine, why he started. I stepped on the rod there to step across, and he started and knocked me down. My feet fell across the track on the engineer's side, and the back trucks of the tender ran over me."

The opinion of the majority does not set forth the testimony of Aikin concerning the cause and manner of his injury, and the above is all that the record shows upon that subject. It will be observed that Aikin does not testify that he had ever before crossed over the open cinder pit in this manner, much less that it *was customary* to do so. He says that the other nights before this while he was working as herder he had ridden on the back end of the tender at the same place where he was going to at the time he was injured, but he does not testify that he had ever before crossed over the open cinder pit in the same manner in order to get to that place, and there is no testimony in the record, either by Aikin or any one else, that Aikin had ever before crossed over the open cinder pit by stepping on the binding rod while holding to the rod on the tender. The record does not, therefore, warrant the conclusion of the majority that "Aikin testified that it was customary to cross over the open cinder pit" in the manner indicated.

To further support its contention that the undisputed evidence shows that such was not the custom, appellant introduced seven witnesses, whose testimony concerning this we quote from the record as follows:

Witness Murphy testified: "Had worked as fireman and hostler in the yards at Cotter. He never heard of any herder crossing the pit to catch the rear right-hand stirrup of the tender

until Tobe Aikin got hurt; never heard of any herder attempting to cross it on the rod so he could get over on the engineer's side; never saw anything of the kind, and never saw a herder take his position there when the engine was standing over the pit."

W. P. Chrisman testified: "That most of the time for the last three years he had been in the employ of the appellant at Cotter as hostler; was familiar with the work of hostler helper. During that time he never saw any hostler helper cross over the open cinder pit behind the engine that was about to move for the purpose of giving the signal from the lower side of the track for the engine to back off the pit. Did not know that he had ever heard of such occurrence." This witness was asked the following question: "Then, if Tobe Aikin was trying to get around on the right-hand side of the tender, he was trying to get to the right side? He was trying to get at his proper place?" The answer was: "Not over the cinder pit; not at cinder pit."

George Morgan, fireman and former hostler for appellant, and who had worked most of the time at Cotter, testified: "That he had never seen or heard of any person ever attempting to cross the open cinder pit to reach the rear right-hand tank stirrup."

J. H. Travis, locomotive inspector for appellant and formerly fireman and hostler and engineer in the yards at Cotter, testified: "He had never heard or seen or known of any one ever attempting to cross the open cinder pit, as Aikin did, to give back-up signals from the lower side of the cinder pit before the engine was backed off the pit."

J. C. Enwood testified: "He lived at Cotter. Was employed by appellant and had acted as hostler off and on about three years; that he had never seen or heard of any herder in his three years' experience crossing over the open cinder pit in the rear of the tank to board right-hand tank stirrup, and that Aikin, who worked for him, never did anything of the kind to his knowledge."

A. S. Pointer testified: "Lived at Cotter; had worked there in the capacity of hostler helper for about ten months." Witness was asked the following question: "Q. You never crossed by or tried to get over on the other side to give the sig-

nal?" "A. I might have done it but I don't remember it. I think this is the way most of them worked." Then he was further asked: "Q. Have you ever crossed so you could get across on that stirrup on the rear right-hand of the tender?" and he answered: "No," and stated: "that he had never heard of anybody else doing it."

Sam Farris testified: "Was hostler in charge of the engine when plaintiff was injured." He was asked the following question: "Q. Do you know whether or not it is or was prior to the thirteenth of June of this year customary for the herder to step across the open cinder pit to the lower side or south side of the track for the purpose of getting on the rear of the tank on the engineer's side to give him the signal to back up? A. I never did; never saw any one else do it."

Fred Harris testified: "That he was hostler in charge of the engine at the time plaintiff was injured. During his career as hostler there at Cotter, covering a period of something like three years off and on, he had never seen or known of the herder ever crossing over the open cinder pit to take his position on the rear right-hand stirrup of the tank."

The testimony of appellant's witnesses further shows that if the engine was carried to the cinder pit to be cleaned the first thing the hostler helper did was to chain the front driver wheel by putting a chain back of the wheel and in front of it so that it could not move. One witness testified "that unless it was chained it would probably move; that there might be a leak in the throttle. If the engine moved it was dangerous; hence they chained the front driver wheel on the fireman's side to avoid accident." After the chaining of the wheel the fire knocker knocked the fire, then the hostler helper took the chain off the wheel, mounted the engine, and went to the sand dome to see if sand was needed. If sand was needed, the herder remained on the engine, riding in the gangway, cab or on the running board to the place where they took sand. If sand was not needed, the herder usually rode in the same manner until the engine had backed off the cinder pit before attempting to cross over to the right-hand or hostler's side. If sand was not needed, sometimes the herder would walk from the cinder pit to the turntable; but they never crossed over the open cinder pit to go to the rear right-hand

stirrup of the tender. They waited until after the open cinder pit was passed, and then, if they desired, or if it was necessary, to take a position on the right-hand stirrup of the tender, they crossed over the track on level ground.

While it was not improper and not unusual for the herder to ride on the rear right-hand stirrup of the tender, still the uncontroverted evidence shows that, in order to reach this position, it was not the custom for the herder to cross over the open cinder pit in the manner that plaintiff was doing at the time he was injured. One witness said that he had never seen a herder take his position on the right-hand stirrup of the tender while same was standing over the open cinder pit "because it would be almost impossible for him to get on there." He further said: "Of course, he could do it, but it would be a terrible shape for a man to get in." Another witness stated "that it had been the instructions all the time to not go across the open cinder pit there without there was a chain under the engine." The fireman always told the hostler helper that unless the engine was chained not to go across behind it and to not cross behind the engine unless it was blocked."

The testimony of the plaintiff himself shows that he had worked for the appellant for about three years as boiler-maker helper at Cotter; that while working in this capacity he usually walked by the cinder pit in going to and from his work; and at times, when called upon, he had served as herder; that he had been in the employment of the appellant about two months when his injury occurred, first working as engine wiper, then as boiler washer, and then, for ten days immediately preceding his injury, as herder. In order to secure emp'oyment the last time, he had represented that he was twenty-one years old and had signed an application for work stating that fact. At the time of his injury he weighed one hundred and sixty-five pounds, was five feet ten and one-half inches tall, and it appeared that the man who employed him thought that he was twenty-one years old. It was shown to be the rule of the company at that time not to employ any one in the mechanical department who was under twenty-one years old. The plaintiff, however, at the trial testified that he was about seventeen years old.

We have set forth in detail the testimony of each of the

seven witnesses for appellant, as well as the testimony of the
plaintiff himself, concerning the issue of contributory neg-
ligence.   The jury would have been warranted in finding from
this testimony the following facts:   That the plaintiff, in order
to secure employment with appellant, had represented that
he was twenty-one years of age;   that h's employer thought
that he was of that age;   that it was against the instructions
of the company to employ any one in the mechanical depart-
ment who was under twenty-one years of age;   that the plain-
tiff, nevertheless, testified at the trial that he was seventeen
years old.   That the plaintiff had had considerable experience
as hostler helper or herder;   that he had worked occasionally
in that capacity three years before his injury, and had worked
for ten days as herder immediately prior thereto;   that it was
the business of the herder to block the front driver wheel of
the engine while same was over the cinder pit in order to keep
it from moving;   that without this the engine would probably
move at any time;   that it was dangerous not to chain the driver
wheel while over the open cinder pit;   that it had been the in-
structions all the time not to go across the open cinder pit
there unless there was a chain under the engine to block the
driver wheel;   that the plaintiff at the time of his injury was
disobeying these instructions;   that the open cinder pit was
about three feet deep and about four feet ten inches wide;   that
the engine had been stopped over this pit so that the rear end
of the tender was within four or five or six inches from the iron
rod called the binding rod;   that this connected the rails on the
track and extended across the open cinder pit and was about
five-eighths of an inch th'ck;   that plaintiff, after taking away
the chain, stepped on the engine, mounted the running board,
and went to the sand dome to see if sand was needed;   that
after doing this, instead of remaining on the engine in the gang-
way, or on the pilot, or running board, where it was customary
for the herder to ride while the engine was being backed off of
the open cinder pit he, the plaintiff, was attempting to cross
over the open cinder pit in order to get to the rear right-hand
stirrup of the tender by stepping on the binding rod and hold-
ing to the rod on the tender;   that while in this position the
hostler backed the engine, causing the plaintiff to fall from the
binding rod and to receive the injuries of which he complains;

that the plaintiff, in attempting to cross over the open cinder pit, placed himself in a position where he knew that the slightest movement of the engine would push or throw him from the rod; that the position was a difficult and dangerous one to occupy; that no herder had ever before been known to occupy such position.

Anticipating what the verdict might be if the jury calmly and dispassionately considered the testimony of the seven witnesses for appellant, Frank Pace, one of the attorneys for the plaintiff, in order to have the jury disregard and reject their testimony, made the following remarks in his argument: "These poor railroad boys—I feel sorry for them. Whenever they are called upon to testify, you place their testimony in one scale and their bread in another." The defendant objected to the remarks, and the court stated: "The jury had the right to consider the witnesses' interest or bias or prejudice in the case as affecting their testimony, subject to the same rules as others—that their testimony should be weighed exactly as that of other witnesses." The remarks of counsel thus went to the jury with the unqualified approval of the trial court. While, the remarks of counsel were improper and prejudicial, the remarks of the court in connection therewith were far more so. Instead of rebuking the counsel for making the remarks and indicating to the jury that same were improper, the court expressly gave them emphatic sanction by saying "that the jury had the right to consider the witnesses' interest or bias or prejudice in the case as affecting their testimony." This comment of the court, in connection with and concerning the remarks of counsel, could mean nothing more nor less than that the jury had the right to consider the witnesses' interest or bias or prejudice as being superinduced by the fact that their bread, or, in other words, their wage, depended upon their giving testimony favorable to the railroad "whenever they were called upon to testify." Counsel did not at the time of making the remarks, and when objection was made thereto, disclaim any purpose of stating facts, and did not say that he was merely "expressing an opinion as to the effect that should be given to the testimony," as he now claims he was doing. The remarks should be judged by the language used at the time and by what the language means, not by what counsel now says

he meant. The counsel, it seems, have succeeded in convincing this court that it was uncertain whether or not he meant by the remarks used to express an opinion or to state a fact, for the court says: "Now, it is not clear from the language used by counsel whether he meant to express an opinion as an inference from the relation shown to exist between the defendant and its employees who testified in the case, or whether he meant to state as a fact in the case that the witnesses would be discharged and thereby lose their daily bread if the testimony they gave was unfavorable to defendant." No plausible descant or expert manipulation of words by counsel can obscure the *plain English* of the remarks themselves as well as the *plain purpose* of the counsel in using them. That meaning was that he knew it to be a fact that whenever the railroad boys were called upon to testify they were compelled to testify favorably to the railroad or else they would lose their employment, and his purpose in stating this as a fact was that the jury might be induced to discredit the testimony of the witnesses for appellant and thereby render a verdict in favor of the appellee.

Counsel began by saying: "These poor railroad boys—I feel sorry for them." This language indicates that he had personal knowledge of the condition which he was about further to describe. Would he "feel sorry" for the "poor railroad boys" when he did not know whether they needed his sympathy or not? Would he be commiserating with them over a condition that he did not know to exist as a fact? No. The reason he "felt sorry" for them was because he knew as a fact that whenever they were called upon to testify they had to give testimony favorable to the railroad or else lose their employment. In our opinion, the language used is susceptible of no other construction. The majority in their opinion correctly announced the rule that has heretofore always been consistently adhered to by this court as follows: "It is well settled by the decisions of this court that it constitutes reversible error for the attorney in a case to be permitted to go outside of the record and to state to the jury a material fact bearing upon the question at issue." Now, why the above wholesome doctrine does not have righteous application to the case at bar we are unable to comprehend. For certainly the attorney was

stating *"a material fact outside of the record"*, and one that was intended and well calculated to cause the jury to disregard the entire testimony of all the witnesses on behalf of appellant; for, in the minds of a reasonable jury, the testimony of these witnesses would weigh but little if they were testifying under compulsion.

In the case of the *St. Louis, I. M. & S. Ry. Co.* v. *Boback*, 71 Ark. 434, counsel in argument, commenting upon the testimony of certain employees of defendant, used the following language: "Their bread and meat depends on the fact that they did blow the whistle, because the law requires them to do it, and the rules of the company require them to do it; and if they did not do it, their company was liable, and they would lose their jobs." Mr. Justice RIDDICK, speaking for the court concerning the above remarks, said: "But counsel went further and stated as a fact, and there was no evidence to show it, that the bread and meat of these witnesses depended on the fact that they did blow the whistle, and that if they did not do it they would lose their jobs. In other words, counsel stated, in effect, that if these witnesses had not testified that the whistle was blown they would have been discharged by the company, and that they therefore testified under a sort of compulsion; but there was no evidence that this was true, and the argument was untrue and unfair. The court should have sustained the objection to it, and we think that he erred in refusing to do so."

In that case the lower court merely treated the objection to the argument with silence, whereas in the instant case the trial court expressly approved it by favorable comment. The court did not reverse the judgment for the error of the improper argument in the Boback case because it was convinced from "the evidence and the reasonable amount of damages that no prejudice resulted." In that case the plaintiff based her right to recover upon the allegation that no signals were given for the crossing. Several witnesses in her behalf testified positively that no signals were given, thus showing clearly the negligence of the company, while, on the other hand, the testimony of the witnesses for the appellant impressed the court "with the belief that their recollection was not quite clear." Hence the case was not reversed, although the argument was pronounced erroneous and strongly condemned.

In the case of *St. Louis, I. M. & S. Ry. Co.* v. *Pell*, 89 Ark. 87, where similar remarks were under consideration, when objection was made to the remarks, the attorney making them immediately withdrew them, and said: "That he was only stating his opinion," and the trial court, in ruling upon the objection, stated that the counsel was "giving his opinion," and immediately instructed the jury "not to consider any statement of counsel outside of the record." In passing upon these remarks the court, through Mr. Justice Hart, said: "In the present case the record affirmatively shows that, if the jury in the first instance understood the remarks of counsel as a statement of fact, that impression was doubtless removed by the disclaimer of counsel that he intended them to have that effect and by the admonition of the court not to consider any statement of counsel outside of the record."

In the case at bar the counsel did not withdraw the remarks, did not state that he was giving his opinion, nor did the court so state, and the jury were not told to disregard the remarks until some time after they had been made. Furthermore, the remarks that the court made in commenting upon the remarks of counsel in the present case, as we have shown, in the connection used, were far more prejudicial than were the remarks of counsel, and were never withdrawn at all by the court, nor were the jury told not to consider them.

In the case of the *St. Louis, I. M. & S. Ry. Co.* v. *Raines*, 90 Ark. 398, remarks of similar purport were made. The trial court at the time promptly sustained the objection to them. This court, speaking of the ruling, said: "Under these circumstances we do not think that any prejudicial error occurred from these remarks." The court, in commenting upon the ruling of the lower court, announced the general principle that counsel have the right to comment upon the interest of opposing witnesses, but this announcement of the correct general principle was made in passing upon the ruling of the lower court sustaining the objection to the improper argument, whereas in the case at bar the lower court at the time not only overruled the objection to the improper argument but used in connection therewith language that, as we have seen, expressly approved it.

In the case of *St. Louis, I. M. & S. Ry. Co.* v. *Waren*, 65

Ark. 619, one of the attorneys for plaintiff said in argument: "If Hall and Meadows had not come before this jury and testified what the railroad wanted them to testify to; that is, that the bell was rung and that Hall and Meadows were in their places, what would have been the consequences? They would have received their walking papers. There has never been a case before a jury where the railroad employees did not come before the jury and testify everything that it was necessary for them to testify in order to maintain their places." The jury was instructed specifically at the time not to consider these remarks, that they were improper, etc. This court in that case, speaking through Mr. Justice BATTLE, said: "The language used by counsel was highly improper, and for the use of it the speaker deserved the rebuke of the court. The rebuke given, if it may be called such, was too mild to impress the jury with a proper conception of the wrong done." And the court, in reversing the judgment in part for this error, further said: "If they (the remarks) did not excite the prejudice, they were calculated to increase it." The purpose of the remarks in the Waren case is precisely the same as in the case at bar. If this court is to follow any settled rules upon the subject, we are of the opinion that the doctrine of the Waren case should control this.

The appellant also assigns as error the following: "Senator Davis, of counsel for plaintiff, was further permitted in the course of his argument, over the objection of the defendant, to refer to the pathetic, bereft and unfortunate condition of the widowed mother of plaintiff, her want and distress following the injury of her boy, and the presence of her little children, and her dependence upon plaintiff for support." The record does not show at what juncture of the Senator's argument the above remarks occurred, but counsel for the appellee themselves do not leave us in doubt as to when it occurred and in what connection it was used. They say in their brief: "It occurred while counsel was discussing the damages and referring to the mental anguish that the injured party had suffered in the past and would likely suffer in the future, calling the jury's attention to his surroundings and the anguish of mind that was possessing him when he was face to face with the dependable condition of a widowed mother and orphan children, and his

inability to aid and support them, rendered helpless by the negligence of the railroad company." The majority, in commenting upon the remarks of Senator Davis, say: "It would, of course, have been erroneous and prejudicial for counsel to make an appeal to the jury for a verdict on account of the pathetic and distressed condition of plaintiff's mother and her dependency upon her son, or for an increase of the amount of damages on that account, for it is too plain for argument that her condition had nothing to do with plaintiff's right of recovery or with the amount of damages to be assessed." Here again the majority announced the correct doctrine, and, as we construe the language of the bill of exceptions, Senator Davis did the very thing which the court says would *"have been erroneous and prejudicial."* Therefore, it would seem to necessarily follow that the judgment should be reversed. But the majority further say: "We can not tell whether or not the remarks were calculated to prejudice the rights of defendant unless we know what was said. * * * The reference of counsel to the bereft condition of plaintiff's mother may, for aught we know, have been made merely by the use of adjectives in speaking her name to the jury as one of the witnesses in the case when he commented on her testimony." Counsel themselves in their brief have confessed that the remarks with reference to the bereft condition of the plaintiff's mother were made "while counsel was discussing the damages," and referring to the "mental anguish that the injured party had suffered in the past and would likely suffer in the future." In view of the court's own language above and the confession of counsel, it is impossible to escape the conclusion that the remarks of Senator Davis were erroneous and prejudicial. The language of the bill of exceptions must be taken to mean what it says. It is the trial court's own version of the language that was used by Senator Davis in his closing argument to the jury, and its meaning is obvious.

How would it be possible "to refer to the pathetic, bereft and unfortunate condition of the widowed mother of plaintiff, her want and distress following the injury of her boy and the presence of her little children and her dependence upon plaintiff for support" in any language or in any connection that would not have been erroneous and prejudicial? But we must

take it that counsel used the adjectives as set forth in the bill of exceptions. These were certainly strong enough, in the connection in which counsel used them, to constitute a powerful appeal to the sympathies of the jury. This appeal, with the auspicious aid of the presence of the legless trunk of the pale, emaciated, and suffering plaintiff, his widowed and dependent mother with her helpless children, to say the least, was well calculated to incline the jury to hold the appellant liable and to compensate the plaintiff as far as possible for the terrible misfortune that had overtaken him. even though the proof might show that his own ordinary negligence contributed to produce it.

This court, in a recent case, in discussing whether or not a reversal should be had for improper remarks of counsel, said: "In the final analysis the reversal rests upon an undue advantage having been secured by argument which has worked a prejudice to the losing party not warranted by the law and facts of the case." *Kansas City So. Ry. Co.* v. *Murphy,* 74 Ark. 256.

In another comparatively recent case, this court, through one of its great judges, speaking of the improper remarks of counsel in argument and the duty of trial courts concerning them, said: "Arguments by counsel of the evidence adduced and the law as given by the court are allowed only to aid them in the discharge of their duty. Within these limits counsel may present their client's case in the most favorable light they can. When they go beyond them, and undertake to supply the deficiencies of their client's case by assertions as to facts which are unsupported by the evidence or by appeals to prejudices foreign to the case, they travel outside of their duty and right, and abuse the privilege of addressing the jury by using it for a purpose it was never intended to accomplish. For such assertions the appeals can serve no purpose except to mislead the jury and defeat the ends of the law in requiring them to confine their consideration to the evidence adduced and the law embodied in the instructions of the court. Hence it is the obvious duty of courts, in furtherance of the object of their creation, to prevent such assertions or appeals, or, when made, to remove their evil effects so far as they can, and attorneys in the making of them, if they are calculated to prej-

udice the rights of parties, are guilty of a violation of the law, of abuse of their privileges, and of conduct unfair and unbecoming to their profession, and should be promptly and sternly rebuked by the court, and, if need be, punished." And, continuing, the court said: "Ordinarily, an objection by the opposing counsel promptly interposed, followed by a rebuke from the bench and an admonition from the presiding judge to the jury to disregard prejudicial statements, is sufficient to cure the prejudice, but instances sometimes occur in which it is not sufficient." *Kansas City, F. S. & M. Rd. Co.* v. *Sokal*, 61 Ark. 130.

None of the salutary safeguards here mentioned were used by the presiding judge in the present case in order to protect the appellant in its rights and to remove any prejudice that may have been created against it by the remarks of Senator Davis. Counsel was not told that the remarks were improper. He was not admonished to desist from further argument of the same character, nor was he in any manner rebuked or punished for having made them, nor was the jury told that they were imimproper and to disregard them. On the contrary, the court, when objection was made, by its silence, acquiesced in the argument, and thus virtually approved it.

The appellant had the right to have the testimony of the witnesses in its behalf fairly considered. There was no inherent weakness in this testimony; it was reasonable and consistent. True, the witnesses were employees of appellant, and the attorneys for the appellee could refer to this fact and argue that the jury should consider such fact in determining what credit they would give the testimony of appellant's witnesses. Counsel had the right to draw any legitimate inferences favorable to their client growing out of the relationship between appellant and its witnesses. Counsel did not choose to do this, but, as stated by Judge Riddick in *St. Louis, I. M. & S. Ry. Co.* v. *Boback*, above, "went further and stated as a fact" matters already alluded to, which, as we have stated, were well calculated to arouse an unjust prejudice in the minds of the jury against appellant and to cause them, without reason, to reject the testimony of its witnesses.

What right had counsel to make this onslaught upon the

testimony of these witnesses? It was not warranted by any evidence to be found in this record. And what right had counsel "to refer to the pathetic, bereft and unfortunate condition of the widowed mother of plaintiff, her want and distress following the injury of her boy, and the presence of her little children, and her dependence upon plaintiff for support" in order to excite their sympathies and to take away their minds from the law and facts of the case? What had all this to do with the question of whether or not the injury was the result of plaintiff's own negligence?

In view of the repeated declarations of this court condemning such practice, it is a reproach to the law and a travesty upon orderly procedure for counsel in lawsuits to supply material facts in argument that they were not able to adduce in evidence, and to make appeals to the jury to return a verdict in favor of their client for increased damages out of sympathy for unfortunate and pitiful conditions depicted by them that had nothing whatever to do with the case. The objection made to the argument of Senator Davis along these lines was seasonable. It could not have been sooner made, and its effect was to ask the court to take out of the case the improper argument and all the incompetent evidence that may have been admitted upon the subject.

Our attention has recently been called to such arguments by same counsel in the case of *St. Louis, I. M. & S. Ry. Co. v. Brown, ante* p. 107.

It seems from this that mere declarations of this court to the effect that such arguments are erroneous and improper, and mere directions to trial courts not to permit them, are of no avail in the practical administration of justice. The mandates of the law upon this subject, as heretofore announced by this court, are "more mocked than feared."

So long as this court refuses to reverse judgments in cases where such improper arguments have been permitted, counsel will still "be clamorous and leap all civil bounds rather than make unprofited return." Since thrift follows the practice, counsel will continue in it. The only effectual remedy for the wrong and injustice done appellant in the present case, as well as the only prevention of a recurrence of similar wrongs to other litigants in future cases, was for this court to reverse the

judgment herein, and, by so doing, follow the rule heretofore announced in the cases of *Kansas City, F. S. & M. Rd. Co. v. Sokal*, 61 Ark. 130 and *St. Louis, I. M. & S. Ry. Co. v. Waren*, 65 Ark. 169, and other cases.

A judgment in the sum of twenty-seven thousand dollars is a large amount to be recovered in a suit for personal injuries. But the injury to the plaintiff was one of the most terrible and shocking that has ever come under our observation, and we are of the opinion that the above sum would not more than afford adequate compensation for the loss of earning power, the bodily disfigurement, the pain, suffering, and mental anguish which plaintiff endured and must endure for all time to come. And, since the negligence of appellant, in our opinion, was clearly established, we would not have dissented from the judgment but for the fact that we believe the majority of the court misconceived the facts and misapplied the law with reference to the improper remarks of counsel as affecting the issue of contributory negligence, which, it must be conceded, was, at least, a very close question. Appellant, therefore, has been deprived of that fair and impartial trial guaranteed to it by the Constitution and statutes of our State, as well as the former decisions of this court above mentioned. The judgment should be reversed and remanded for a new trial.

Mr. Justice HART concurs.