BALDWIN ET AL., TRUSTEES Mo. PAC. RD. CO. *v.* HUNNICUTT.

4-4222

Opinion delivered March 16, 1936.

*R. E. Wiley* and *Richard M. Ryan,* for appellants.

*John L. McClellan* and *Tom W. Campbell,* for appellee.

McHaney, J.   Appellee was, at the time of receiving the injuries hereinafter mentioned, an employee of the Missouri Pacific Railroad Company as a carpenter in the B. & B. gang.   On February 24, 1934, while engaged in repairing the coal chute and tracks connected therewith, he received a severe and painful injury which resulted in the loss of his left eye.   At the time of the injury he was working under the immediate direction of his foreman and was assisting in the removal of a 6x8 timber on the incline track, leading up to the coal chute, which is called a guard rail.   These guard rails are notched down over the ends of the ties on both sides of the steel rails and about 11½ inches therefrom.   They are also held in place by what are called lag screws ⅝x9 which are inserted through holes bored through the guard rail and a short distance into the tie, and are driven or screwed into the tie about three inches.   The lag screws have square heads and are screwed down with a wrench or driven down to fit tight on a metal washer through which the screws pass.   Every second tie is so fastened with a lag screw. In order to remove the guard rails it became necessary to detach the lag screws from the ties.   Appellee says the proper and customary way to do this is to unscrew them with a wrench, but that they had no wrenches that would fit the screw head.   He also says another proper way to remove them is to cut around the head with an adz, insert a claw bar, and prize them loose.   On this occasion, however, they did neither, but the assistant foreman put a jack under the guard rail, elevated it sufficiently to put a strain on the ties to be detached, and his foreman handed him a twelve-pound maul and directed him to strike the ties and drive them free from the lag screws.   After striking the tie next to the jack two or three blows, something flew up, struck him on the lip, cutting it and slightly injuring his nose and struck his left eye with such force as to destroy the eye-ball which necessitated its removal.

He brought this action to recover damages for his injuries under the Federal Employers' Liability Act, and

alleged negligence as follows: "When plaintiff struck said tie with said maul, as directed by his foreman, a large metal spike that had been negligently and carelessly left on said track by the agents, servants and employees of the defendants, and near said tie which plaintiff struck, was caused to be knocked upward and thrown violently against the plaintiff," etc. Trial resulted in a verdict and judgment against appellants in the sum of $10,000.

For a reversal of the judgment, appellants argue a number of assignments of error. In view of the disposition we make of the case, we think it unnecessary to discuss them all in detail. It is very earnestly insisted that the evidence is insufficient to establish negligence, or to take the question of negligence to the jury. While no witness testified that "a large metal spike had been negligently and carelessly left on said track—and near said tie which plaintiff struck," something did fly up and hit him causing the injuries complained of. No witness testified as to what it was that flew up and hit him, whether a loose spike lying on the tie or the guard rail or the track, whether the rail spike holding the steel rail on the tie being struck or whether the lag screw from which the tie was being driven broke loose therefrom, and flew up and hit him. As stated above, appellee testified there were two safe and customary ways to remove the lag screws, either with a wrench or with an adz and a crow bar, but that he had never pounded them loose with a maul. Witnesses for appellants testified that, in addition to these two ways to remove them, the method employed at the time of this injury was also used, and that all three methods were considered safe and proper. The majority are of the opinion that the evidence was sufficient to go to the jury on the question of negligence since appellee was acting under the immediate directions of his foreman in the manner of doing the work, and that the injury received or some injury might reasonably have been foreseen by the exercise of ordinary care as to the manner of doing the work by the foreman. Mr. Justice BUTLER, Mr. Justice BAKER and the writer do not agree that any

negligence has been established, but on the contrary a directed verdict should have been given appellants.

Another assignment of error relates to the impaneling of the jury to try the case. Twelve of the regular panel were out on another case. The court directed the sheriff to call twelve bystanders whose names were placed in the box with the remaining members of the regular panel. The clerk by direction of the court drew eighteen names from the box. The court examined them on their *voir dire,* and all appeared qualified. Counsel for appellee was then asked if he desired to ask any further questions, and answered in the negative. Counsel for appellants was then asked the same question by the court, when the following occurred: ''Mr. Ryan: I want to ask a question or two, but I would like to know the jurors, I don't know them by name; will you permit me to ask who No. 1 juror is? I don't know them. The Court: That is where you are unfortunate in not living in Saline County. Mr. Ryan: Note my exception to the ruling of the court. I certainly would like to live down here, if I could make a living down here.''

In this we think the court fell into error calling for a reversal of the judgment. We think counsel had the right to interrogate the jurors to determine their names, residence, business, and such other information as would enable him to exercise his right of challenge for cause or peremptory challenge without cause. In *Clark* v. *State,* 154 Ark. 592, 243 S. W. 868, we held that a party is entitled to the same latitude in examining a juror to determine whether to exercise a peremptory challenge as when seeking information relative to challenge for cause, subject to the sound discretion of the court. The court not only denied counsel this right, but in doing so—facetiously, no doubt—hurtful, nevertheless—stated that counsel was unfortunate in not knowing the jurors by name, because he did not live in Saline County. The error, however, is the denial of a litigant the right to try to determine, in good faith, by examination on *voir dire,* who and what the jurors are who are to try his case.

The question is also argued as to whether appellee was engaged in interstate commerce within the meaning

of the Federal Employers' Liability Act. We think the evidence sufficient to take that question to the jury. Other questions are argued which may not arise on another trial, and we do not discuss them.

For the error indicated the judgment is reversed, and the cause remanded for a new trial.

McHaney, J. (Supplemental opinion on rehearing). On rehearing, counsel for appellee insist that they "do not know of any provision of law in this State that entitles either party to a civil suit to have each proposed juror stand and be separately interrogated by counsel." Section 6380 of Crawford & Moses' Digest provides that: "In order to determine a challenge for cause the particular juror or jurors challenged may be sworn, or, at the instance of either party, all of the jurors may be sworn to make true and perfect answers to such questions as may be demanded of them touching their qualifications as jurors. The court may allow other testimony in regard to the qualifications of any juror." The next section provides that each party shall have three peremptory challenges and § 6385 provides the procedure for challenges for cause. This court has recognized the right of litigants in civil cases to examine the jurors separately. In *St. L. I. M. & S. R. Co.* v. *Aiken*, 100 Ark. 437, 140 S. W. 698, this court said: "There is but one other assignment of error, and that relates to the ruling of the court in refusing to permit defendant's counsel to pursue the examination of a juror as to his bias. After a lengthy examination of the juror by counsel, the court stopped the examination, and said that it was sufficient. Counsel then challenged the juror peremptorily, and agreed to a trial of the case before eleven jurors. It does not appear from the record that defendant exhausted its peremptory challenges and was compelled to accept a juror which it otherwise would not have accepted; therefore, no prejudice resulted from the ruling, even if it was incorrect. The extent of the examination of the juror rested, however, within the sound discretion of the trial court, and there was no abuse of that discretion. Defendant was permitted to pursue the examination until every matter

bearing upon the juror's qualifications seems to have been fully drawn out.''

The holding in this case was cited with approval in *Mo. Pac. Ry. Co.* v. *Riley,* 185 Ark. 699, 49 S. W. (2d) 397, where the court said: ''Exception was saved to the qualifications of one of the jurors on the panel because it was shown upon his examination that he was a member of the board of aldermen of the city of Hot Springs. The exception to the competency of the juror was based on the theory that the negligence of the city was the proximate cause of the injuries, and, as the city was interested, the fact that the juror was an alderman disqualified him. It is not necessary to say whether or not this juror was disqualified, for there is no showing of prejudicial error, since it is not shown that the appellant had exhausted all of its peremptory challenges.'' Citing cases.

It will be seen from the Aiken case, *supra,* that the discretion which rests in the trial court does not relate to the right to examine jurors separately, but only to the extent of the examination of each separate juror. This same case is cited in 35 C. J., p. 389, § 439, in support of the following text: ''The extent to which parties should be allowed to go in examining jurors as to their qualifications cannot well be governed by any fixed rules. The examination is conducted under the supervision and direction of the trial court, and the nature and extent of the examination and what questions may or may not be answered must necessarily be left largely to the sound discretion of the court, the exercise of which will not be interfered with unless clearly abused. In practice, considerable latitude is and generally ought to be indulged; the questions ought to be confined to matters directly affecting the legal qualifications of the juror, and all questions ought to be allowed which are pertinent to test the juror's competency. But such examination ought not to be permitted to take an indefinitely wide range concerning merely collateral or incidental matters having some connection with the case, and should be confined in some degree at least to the particular cause of challenge under investigation at the time. * * *''

We are, therefore, of the opinion that litigants in civil cases, as well as in criminal cases, have the right to examine the jurors separately in order to determine whether such jurors are subject to challenge for cause, or to elicit information on which to base the right of peremptory challenge, subject of course to the right of the court to control the extent of such examination, acting in its sound discretion. We think this right is recognized by our statutes and by the decisions above cited. The petition for rehearing is therefore, denied.